Good morning, Your Honors. May it please the Court, I'm John Davidson. I'm from Charlottesville here by appointment of the Court to represent Edward Ferris, who was convicted of bank robbery following a jury trial in Charlottesville about a year and a half ago. I have to lead off with a concession. I wish I didn't, but I do. I had planned to spend virtually all my time today on the evidentiary issues, and I will, but I have to address the issue of the juror. With the issue of the juror, effectively, I'm asking you to do what really only the Supreme Court can do, which is to get me through Martinez-Salazar, which is a Supreme Court case. As you know, that said, if a district court has abused its discretion in failing to strike a juror for cause, but trial counsel cured that by exercising one of his peremptory challenges, well, then, that can't be brought up on appeal. That issue is no longer before the appellate court. I wish that wasn't the law. I think the law should be changed, but I have to concede that that does bind me here because, in fact, I did exercise that peremptory because, in fact, I thought that juror would have been pretty terrible for us. So just very briefly, and I'll move on to the main course in just a moment, I'm raising this issue because it's the only way now that I can preserve it if I end up needing to petition for certiorari, where we've got this odd sort of appellate issue here. And so just very briefly, I do think that it ought to be seen as a due process violation to make me use one of my peremptory challenges to deal with that issue. Did you use all of them up? I sure did. I used all of them up. I wish I had some more. I wish I had some more. Eventually, he'll be cured. Turns out I needed 12 more. Sometimes you have to be alert. Yes, Your Honor. And for a brief shining moment this weekend when I was... Go up there and argue. Go up there and argue with Thurgood Marshall, Justice Marshall, I ask for. That's limited just to for cause. It would be the honor of my life to argue in front of Justice Marshall. But in any event, this weekend I thought I saw a brief shining moment where I could get through this case, and I just can't. So that I can point to this on the record when I do petition for certiorari. If I can't convince you otherwise today on something else, I've said what I needed to say. Glad you conceded that. Yes, and I must. Neither one of us briefed it, but it was appropriate, and I thought I should. So let me get to the main course, the evidentiary issues. Obviously, the government thinks they had a very strong case, just as obviously for the reasons I stated on the brief. It's okay. My good friend and colleague is sick, and she didn't take my advice to let me beg the court's indulgence to put this off. And so I spent the morning with her, but in any event, I beg the court's indulgence on her behalf. She's being a trooper and earning her government paycheck today. And I will be driving her home. She doesn't know that yet. But in any event, getting to the main course, let me start off with the issue of Mr. Ferris's efforts to challenge the government's interpretations of his words to his mother. As your Honors remember, one of their best pieces of evidence, what they thought was one of their best pieces of evidence, was the recorded jail call to his mother just before there was a search to be done on his parents' home. He called his mother, and the government repeatedly asserted to the jury, very forcefully, very skillfully, advocated to the jury that what he meant by his words was to say, hey, Mom, hide the evidence of my bank robbery. Now, of course, when you look at the transcript, he said nothing like that. He used very vague words like junk. He was a big fan of the word junk, get rid of the junk, move the junk, hide the junk. And so three, four days into trial, this was a long, tedious trial. When he finally had his chance to rise, he got up there. The government had accused him of doing X. I tried to tee up for him, did you do X? And to give him that opportunity to respond. Did you, were you asking Mom to hide the evidence of a bank robbery? And I need to digress a little bit. I know I went off a little bit in my brief about trial advocacy, and maybe it's not the best appellate advocacy to give a rousing defense of trial advocacy. But what I want to say here. You use that stuff, don't you? I do, actually. Yes, sir. The reason I'm going off on it is that there's a whole other school of thought that we don't focus on in appellate advocacy as much when we talk about things like harmless error and abuse of discretion, all the other things we say when we say, well, someone's not really entitled to a perfect trial. You're entitled to a pretty good trial, close enough. And that's this. When we look at the system we've created and we say, okay, defendants, what do you have? What tool do you have to even the score when you have the FBI agents and the technology assistants and the paralegals and the extra lawyers on the other side of that courtroom, and it's you and your Criminal Justice Act panel attorney on that side, what do you have? And the answer this Court's given over and over is trial advocacy, vigorous cross-examination, vigorously advocating through direct examination. That's what we say over and over. And so when we get to an issue like this one where I got derailed here and I got derailed with Lieutenant Terrell as well, which I'll get to in a moment, yes, we can say, well, but you kind of got it in indirectly later. Or you got it in glancingly over there. Or you more or less did it over here as well. What is the point you're making here? Are you saying that's a leading question? Is that where we're getting on this? I don't think this was a leading question at all. I think it was a non-leading question. Could have answered no, could have answered yes. The point here is that your client was not able to say, answer that question about the bankruptcy. Yes, sir. And you think that's a basis for reversal. I'm arguing that. And there was nothing else. You didn't get a chance to bring this out anywhere else. No, I can't quite say that, Your Honor. Well, tell me, how did you bring it out otherwise? Well, my opposing counsel was quite right. It was a very difficult direct examination of the defendant there. He was upset, and I was trying to help him exercise that constitutional right. And the evidence rules do say we get to, can ask some leading questions to develop the evidence, but I don't think that was leading there. Elsewhere, in some rambling ways, it's true, he did articulate what he meant otherwise. You ultimately did get that information out. That's the point I'm asking. Not in the best way, but yes, I did. What are you complaining about? Because what Judge Moon, who's a wonderful judge, by the way, but what he did when he stopped me right there was he just derailed that whole point. Judge, it messed up your flow. He messed up my flow. Like that ball game we saw this weekend, it messed up your flow with the commercials that sometimes you can't go with. Is that what you're saying? Yes, sir. That has never been a basis for reversal that I knew of, has it? I know, but if you listen to me, you're going to be the first, and I think you should be. Because we really are going to. I'm not trying to be funny or cute. You're going to reverse a case because you asked the question and ultimately got it, got the information in, and there's something here. You're going to tell me why this case is the case to reverse because your flow was interrupted. If this was the only issue I had, I couldn't even be saying this, but it happened to me several different times. And on a case that we say was on a knife edge, when you sort of aggregate them, I say it does tip the scale enough. And that's especially so here, which uniquely was. We don't do that either. I mean, that sounds good, but we don't say, okay, got all these, therefore collectively. I don't know we do that. Yes, sir, but let me advocate why you should, especially in a long trial. This was. Sort of like the first issue, you're preserving this for the Supreme Court. Well, yes, but there's no controlling authority saying otherwise. You're essentially able to look at this and say, okay, in this particular case, not as a broad principle of law, but in this case, were there enough of those errors where trial advocacy got derailed that we think, you know, we ought to do a new trial on this one. You've got some bad facts there, don't you? I can't concede that, Your Honor. Counsel, can we roll back a little bit? Yes, sir. How did they get the evidence in that his intent was to have his mother be involved in obstructing justice and hiding something? How did they get that in? It was effectively advocated through very good questions by Ms. Healy and then in her opening and her closing statements. So not by evidence? That's not evidence. The two things you showed, opening and closing, that's not evidence. True enough, but it was when a prosecutor argues, and I'm not criticizing at all, she's wonderful, but when a prosecutor argues to a jury, this is the meaning you ought to take from this, from the defendant's own words. Supreme Court's told us the defendant himself is the very best person to rise and say, no, that's not what I meant. And at that crucial moment in time, he was stopped. And what makes this case, I don't want to say unique, but a little bit different is that it was a long and tedious one. What do they teach us? What do juries listen to? Primacy and recency, first and last. All they heard first was the government's evidence, which is, of course, the way things are. So I was trying very hard to say, okay, let's break up this team. Let's let them know what's important. And so if, of course, it's true, all of us who spent decades paging through hundreds of pages of transcripts, we can all say, okay, we got it in over here. We got it in over there. Yes, we've touched on every element. We can do that. But that's a lawyer's answer. That's not really a juror's answer, a jury who's been bored, not because of anything we do. You could have upset their flow. Did you object to that in opening statement? I don't want to say. She actually directly said it in the opening statement. Yeah. They put it in an opening, something that they're not going to be able to offer the court. Profitably, they'll get that in. And at closing, there's no evidence of that. Yeah. I didn't hear Ms. Healy do anything that I thought was objectionable. She was doing a good job advocating. And I can certainly get up there and get myself inching towards vouching and say, well, that's not what my client meant, but it's so much more effective to have him do it himself. But you have to ask an appropriate question in the right form. The proper objection to your question wasn't his. I mean, it wasn't leading. It was his form, the form of the question, which could have been restructured. But go ahead. Understood. Well, where I'm ultimately trying to go, not just here but with Lieutenant Terrell as well, for example, you saw where I was trying to go there. I was obviously trying to funnel him, get him to say in his experience, factually, girlfriends do lie to protect boyfriends. And if you remember, that was a major theme of our case, that her boyfriend, the brother of Keisha, the boyfriend of Sherry Scales, sometimes lie to protect their boyfriends. Yes. Sometimes you've been lied to, sir. Yes. You don't always know when you're being lied to in your experience. Yes. You have tools that you use to try to figure out whether or not someone's telling you the truth. Yes. You didn't use those tools here. I mean, he knows this, so what? He's not an expert on any of this stuff. And sometime before I get all the way to my closing after I've been beat up for five days, I'm trying to get to the jury that the women who threw my client under the bus, and that's what it was, his girlfriend, his sister, and another paramour threw him under the bus, that that's what actually was going on, that they misled the police. If I save that for the last half hour of a 40-hour trial, I've lost. And so that's what I was trying to do. It goes to the form of the question that the Chief just has indicated. I mean, the form of the question, you know, in terms of asking in a conclusory manner as though you're asking his opinion, didn't you experience the girlfriends do this? I mean, that's not going to go anywhere. What does it mean if it's in everybody's experience? I can say, yes, so what? Yes. That's right, Your Honor, but I was asking the easy questions. I knew he would say yes to first so I could lead him all the way to the end. If I just popped it. You need to simplify them a little bit more and not be so reaching with the question. I mean, it was, as you say, you know, you teach trial advocates, you know, this is a general thing. You have to kind of lead into it. Sometimes you get a tough judge, the easy judge, most of them says, go ahead, answer the question, because he knows that ultimately it's not going to matter whether or not you answer that question one way or the other. But this case you had a judge that says leading. Probably wasn't leading in some instances. Maybe not with the washing machine, I don't know, all that. But you still can get it in. You just have to go, what I call dumb the question down a little bit. And I did elsewhere, and I can't tell you I didn't. Indirectly, glancingly, and then, you know, I got it sua sponte from the witness where I needed to. I did get it in elsewhere. But I'm mostly here to, of course, I'm trying to help Mr. Ferris any way I can. And here it really did feel like the trial advocacy got knocked off on this one. And it is something that we ought not just say, well, you got it in over here. And we know the jury must have paid attention because, of course, all those things we teach and talk about, and every time you've said, we need skillful cross-examination and forceful advocacy, that's the lifeblood of the criminal defense system. It's true on the civil side, too, where I spend 95% of my time. But it's especially true on the criminal side where that's what we have to check the power of the government. Take that case as you got it. I mean, you got that case. He had already made these calls when that police sailed. He makes his call, and then he calls his friend to go in and pick up stuff. And then he's got DNA on a jacket. He's got explained while he's up there, and he gives an explanation. Credibility situation is all that is. The jury can believe it or not believe it. Yeah. You're right. There is considerable evidence against my client, and that's why I just had to attack aggressively every piece that I could. And that's what I was – with the tools I had in front of me. And that's what I was trying to do as best I could. But the way you're presenting your case before us now, you're suggesting that, I mean, in order to be successful, you'd have to say all of these interruptions of flow on the totality suggests a pattern of the way the judge handled the case showed some bias. I don't think you've made a biased case at all. No, absolutely not. I'm not saying that. Then you don't have a case. No, I don't have to say that the judge was biased, and I don't. He's a wonderful judge. All you're saying is that I lost my flow in questioning and direct and cross. It would borderline that. Where are you going with that? Because one time, didn't the judge help you and say, well, everybody knows that about what girlfriends might do. Didn't the judge say that? Wasn't it in the record somewhere that he said, well, the point you were trying to make is that everybody needs it. You don't need an expert on that. And he directed me right then and said, Mr. Davidson, this is an inappropriate line of questioning. Shut down my whole line. He made the point for you. If that's what you're trying to say, yes, everybody knows that. So there's no evidence of bias or any pattern. So how do you tether your argument to a legal precedent that we could even rule for? I'm out of time. May I answer your question? Yes, you can answer my question. Yes, sir. The answer to the question is I simply do believe the ruling was wrong, and what I'm effectively arguing now is harmless error. Basically what I've been doing this whole time. I say it was wrong. That was the wrong evidentiary ruling. And I'm arguing harmless error, and I'm telling you, it's not harmless. When we just focus on one little thing, okay, maybe that one wasn't so bad, but when all I have is trial advocacy to fight all this stuff, it really would have been nice not to have that tool taken away from me. I don't mean to say it so dramatically as that. He was not being biased in the least. Do you think the overwhelming evidence in this case against your client made it harmless, beyond a reasonable doubt? I have to argue otherwise that, and I laid it out in my brief, some of what I thought were the most stout responses we had to their tough pieces of evidence. We thought it was much closer. And, in fact, this jury was out for a very long time and asked a whole lot of questions. I know we can't read too much into that, and I know we're all stuck with a cold record. All appellate judges are. But the feeling in that courtroom was pretty tight for a while there, world according to me, in any event. Thank you for your time. I appreciate the overtime. Thank you, counsel. Thank you. I am so sorry. That's not the way I wanted to start. Good morning. May it please the Court. I'm Nancy Haley for the Western District of Virginia. And I, too, would like to apologize on the jury question first because I was looking up some last law yesterday. I found the very case that Mr. Davidson pointed out, Martina Salazar, which I also agree. There's one sentence, and that would have been your reply, wouldn't it? Excuse me? One sentence could have been your reply. Absolutely. And us reading all that extra stuff. Absolutely. But even without that, if he is preserving the issue, I would say that the record is clear. She said she could give a fair trial to everybody, and there was no evidence that there was an unfair or impartial trial or jury. So with respect to the other questions, I think this Court has already made some comments about the weight of the evidence, of course, and we would argue that the evidence in this case was extremely devastating to the defendant. Those jail calls were a great asset to the case. But all the other pieces of this case, of course, corroborated what was said in those particular calls. I would point out, first of all, that the Supreme Court, obviously, in Delaware v. Van Arsdale, said that a defendant has absolutely a right to a fair trial but not a perfect one. And I must say, my great colleague, if he could only find four places to complain about some of the evidence, some of which was the flow of the evidence, I think that's a good day for the government. I would point out that if we were to follow my esteemed defense counsel's theory, it would eviscerate the idea of having counsel ask follow-up questions. So with respect to the questions, for example, that were asked of the defendant, the cross-examination of the defendant, there were only two places where I objected, saying that they were leading. I didn't say they were irrelevant. No one said that they were irrelevant. I know Judge Gooding… It wasn't really a leading verdict. Huh? The Chief Judge has indicated it basically was a formative question. It wasn't so much leading about asking those questions. Correct. I think that's right. Well, you're just bored. You just need to do something because even if you answered it, what was the answer? What did it mean in the case? Sometimes when you make an objection, you wonder, well, let him answer it. So what? That is true. And there are times I will look back at the record and say, okay, I could have answered it. But I will say that if you look at the defendant's testimony, which I think took up 87 pages, he made very clear that his testimony was showing I did not commit the robbery. I did not do anything to get rid of evidence. I did not commit any of the crimes. If you look at the first page of Mr. Ferris' testimony, Mr. Davidson asks him, Did you rob the SunTrust Bank in Culpeper on January 6, 2015? No, I did not. This is page 540 of the joint appendix. Have you ever robbed the SunTrust Bank in Culpeper? No, sir. Have you ever robbed any other bank in town? No, sir. Of course, that was irrelevant. Did you commit the crimes the government is accusing you of? No, sir. Are you positive you did not commit the crimes the government is accusing you of? Yes, sir. And then he gets to some of the specifics about the jacket and everything else. So I would suggest to you that that is already stated. I haven't committed these obstructive crimes, which he was convicted of. So one of the crimes he was convicted of was, I think it was two, conspiracy and aiding and abetting the destruction of evidence. So that's a credibility issue, as this Court has pointed out. That's in the jury's province. So I would suggest to this Court that the whole trial was designed to give Mr. Ferris his day in court to say, I didn't commit the robbery. But the evidence was so strong against him, the jury rightfully found that he committed the robbery, helped destroy evidence. They didn't find one witness tampering. They hung on a constructive possession for the time that the gun was removed by Mr. Waters. Obviously, district courts have very broad discretion in how they decide on evidentiary issues. And the ultimate question is whether a district court acted in an arbitrary fashion or restricted the defendant's testimony, for example, to a degree not warranted by the demands of the evidence and trial management. I would suggest to this Court that the defendant had his day in court. He was able to state a lot. In fact, he went farther than most of the questions. Most of my objections ended up being the fact that he was not responsive to the questions, or he didn't stop when he had answered the questions. So he was allowed to give his whole story. But ultimately, as this Court has stated, even if you find that any of the four errors were, in fact, errors, you go to the harmless error analysis. That's very clear. And you had the calls, the DNA. I know this Court has pointed out these things. Ms. Ford's testimony, Mr. Sean Ferris' testimony. You said even if you find an error, you go to harmless error. But as I understand it, with a leading question, the question is whether the trial judge abused his discretion and whether there was prejudice or an injustice to the defendant. If you found that there was no error there, where would you go with it? You wouldn't go anywhere. If you find that there's no error, that's the end of the inquiry. Well, it was my question. If you found there's no error, then you go to the harmless error. How do you – I mean, you sort of subsumed in the early determination. That's correct. And I was probably inaudible in what I was saying, Your Honor. All I was saying was even if this Court had found that any of the four errors about which Mr. Davidson complained were appropriate errors or were actually errors, then you go to harmless error analysis. I don't think you need to do that in this case. I think that the judge was correct in what he did. Mr. Davidson had the ability and, in fact, exercised his ability to ask proper follow-up questions to make sure he got out the defendant's side of the story. And I don't think there was anything that this judge did to stop that from happening. With respect to the question, for example, I don't think Mr. Davidson said much about the question to Special Agent Blake. All of that was hearsay. The two witnesses that he was trying to ask him about actually testifying, Mr. Davidson ably cross-examined those two witnesses. That was Keisha Watterson. Actually, he called Sherry Scales as the other witness. With respect to the defendant's testimony, I would suggest to this Court that if you look at the whole testimony, it got out his story. There was no error. The district court properly exercised the wide discretion that it has in terms of making sure questions are asked properly. Obviously, there's no constitutional right to ask a leading question. And as I stated before, the objections I made were sustained on leading, but they weren't sustained on relevance. So he was able to ask other questions, and he did. And if the Court doesn't have any other questions, go sit down. Thank you. Mr. Davidson, you have some time reserved. Yes, sir. Thank you. Briefly, we all, or at least I like to think I speak in prose, but when I hear myself or see a transcript later, I realize I haven't done such a good job at all. So let me just touch base on one or two other items that I'd like to touch on. Very briefly, the jury issue, to make sure I'm not inadvertently waiving it before your honors. In your brief, you certainly have not. It's not fully in my brief the way it should be. And if it's not in your brief, you can't argue. Well, I understand if I might. Go ahead, counsel. I'm just telling you what the structure of the rules for oral argument is. Go ahead. Following up briefly on that Supreme Court case that's in my way on the jury issue, I think it would be a much better rule if you all could consider the issue of whether or not a juror should have been struck for cause, because if we leave the rule in place that says, well, if you exercise your peremptory there on a bad ruling, we're not going to have not nearly enough appellate development of the law of what's good enough, what's jury bias, what's a juror bias, and what's not. Since we've had that rule, I just don't think there's going to be enough cases rising up, because it's such a gamble on the part of a trial advocate to say, oh, my goodness, that trial judge should have knocked off that biased juror, didn't, but I'm not going to use my peremptory and roll the dice and leave that horrible juror on there. We're just not going to get enough appellate development of the law, and that's the argument I intend to make on that. Other than that, I'm going to rest on my briefs, but I want to thank you for taking this on oral argument. I think it's very important for a criminal defendant to see the judges spending this much time on it, and I'm personally grateful. Thank you. Thank you so much, counsel.
judges: Roger L. Gregory, James A. Wynn Jr., Pamela A. Harris